ORIGINAL
FILED

08 JUN 23 PM 3:28

DEPUTY

Eileen L. McGeever, Esq. SBN 62076
Luci M. Montgomery, Esq. SBN 204986
**RUSHALL & McGEEVER**
6100 Innovation Way
Carlsbad, California 92009
(760) 438-6855

Shawn Khorrami, Esq. SBN 180411
**KHORRAMI POLLARD & ABIR LLP**
444 South Flower Street, 33rd Floor
Los Angeles, California 90071
(213) 596-6000

Attorneys for Plaintiffs Sumner D. Bearman,
Individually and on Behalf of All Others
Similarly Situated

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUMNER D. BEARMAN, Individually And On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION; BANC OF AMERICA INVESTMENT SERVICES, INC.; and BANC OF AMERICA SECURITIES, LLC,<br><br>Defendants. | CIVIL ACTION NO.<br>**'08 CV 1115 J WMc**<br><br>**CLASS ACTION COMPLAINT**<br>[Securities Exchange Act of 1934 and Rule 10(b)5 promulgated thereunder]<br><br>**REQUEST FOR JURY TRIAL** |

Plaintiff Sumner D. Bearman brings this action on his own behalf and on behalf of all others similarly situated (collectively "Plaintiffs"), against Defendants Bank of America Corporation, Banc of America Investment Services, Inc., and Banc of America Securities, LLC (collectively "Defendants"), Plaintiff alleges on information and belief, except as to the allegations that pertain to Plaintiff and his counsel, the following:

///

///

**INTRODUCTION**

1. This action is brought as a federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10(b)5 promulgated thereunder.

2. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased and continue to hold "auction rate securities," ("ARS") as defined herein, offered for sale by and through the auspices of Defendants between May 31, 2006 and February 13, 2008, inclusive (the "Class Period").

3. Defendants represented to investors that auction rate securities were equivalent to cash or money market funds; were highly liquid safe investments for short-term investing; and were suitable for individual investors as well as entities, with at least $25,000 of available cash and as little as one week in which to invest.

4. Defendants knew, but failed to disclose material facts about auction rate securities to Plaintiff and the other Class Members. In particular, Defendants knew, but failed to disclose that auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because Defendants were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability. Defendants knew, but failed to disclose that auction rate securities would become illiquid in the event that Defendants stopped maintaining the auction market. Defendants further failed to abide by the disclosure and other requirements imposed upon them by terms of a Cease and Desist Order entered into with the Securities & Exchange Commission in 2006, whose purpose was to remedy existing and prevent further abuses in the auction rate securities market.

5. On February 13, 2008, 87% of all auctions of auction rate securities failed when Defendants and other major broker-dealers did in fact refuse to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, including Defendants, the market for auction rate securities collapsed, leaving the holders of more than $300 billion nationally in auction rate securities with no means of liquidating these investments, despite the fact

1  that Defendants had intentionally offered and sold ARS as a suitable alternative to money market
2  funds and other short term cash management vehicles. The illiquidity and subsequent write-downs
3  of value of these investments has proximately called substantial and continuing damages to all
4  Plaintiff/Class members.

## THE PARTIES

6. Named Plaintiff Sumner D. Bearman at all times material to this action has been a resident of the State of California, County of San Diego. Defendants purchased in his account approximately $2 million of investments in individual municipal bond ARS, in the circumstances hereinafter described as common to the class, immediately prior to the collapse of the ARS system in mid-February, 2008. Plaintiff has suffered the effects of the illiquidity and loss in value of his investment funds which have been inflicted on the Plaintiff Class.

7. Defendant Bank of America Corporation is a North Carolina corporation headquartered in Charlotte, North Carolina. Bank of America Corporation is a bank holding company and a financial holding company registered under the Gramm-Leach-Bliley Act. Bank of America Corporation conducts substantial business within this District.

8. Defendant Banc of America Investment Services, Inc. ("BAIS") is incorporated in Florida and its principal executive offices are located in Charlotte, North Carolina. BAIS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). BAIS is a wholly owned subsidiary of Bank of America Corporation. BAIS conducts substantial business within this District.

9. Defendant Banc of America Securities, LLC ("BAS") is incorporated in Delaware, and its principal executive offices are located in Charlotte, North Carolina. BAS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). BAS is a wholly owned subsidiary of Bank of America Corporation. BAS conducts substantial business within this District.

10. Unless specifically noted, "Bank of America" refers collectively to Defendants Bank

of America Corporation, BAIS and BAS.

11.   Defendants, the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendants has or had a controlling interest are intended to be excluded from this Class.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

13.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), § 1337. As referenced, Defendants regularly conduct business within this District, and many of the acts giving rise to the violations complained of herein took place in this District.

14.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class consisting of all persons and entities who purchased auction rate securities from Bank of America between May 31, 2006 and February 13, 2008, inclusive, and continue to hold said securities. These securities have been rendered illiquid at best and illusory/devalued at worst by the actions of Defendants as hereinafter delineated.

16.   The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States. Bank of America was a significant underwriter and seller of auction rate securities while the market for such securities existed. While the exact number of Class

members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members, individuals and entities, in the proposed Class. Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c) The manner in which members of the Class have sustained damages and the proper measure of damages.

18. Plaintiff's claims are typical of the claims of the Class members. Plaintiff and the Class members have all sustained damages as a result of Defendants' conduct. Moreover, Plaintiff's entitlement to the relief prayed for is based on the same legal and factual theories as the other Class members, thus satisfying the requirements of Fed.R.Civ.P. 23(a)(3).

19. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation, thus satisfying the requirements of Fed.R.Civ.P. 23(a)(4).

20. In the alternative to F.R.C.P. 23(a), the Class may be certified under the provisions of Fed.R.Civ.P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the

interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

21.   Auction Rate Securities ("ARS") are securities whose interest or dividend rate is reset periodically. They usually have a long-term maturity (or, in the case of preferred securities, no maturity). They may be issued by municipalities or other authorities in the form of tax-exempt or taxable bonds, or by corporations (the "issuer") in the form of bonds or preferred stock.

22.   There are three separate types of ARS, in general.

(1) Municipals, known as MARS, which are issued by municipalities, cities and industrial development boards.

(2) Student Loans, known as SLARS, issued by states which have established quasi-independent loan systems.

(3) Auction Rate Preferred Securities issued by mutual fund companies such as Evergreen, Nuveen, Eaton Vance and Pimco, to provide financing at short-term interest rates to invest in other securities for the benefit of the common shareholders of closed end mutual funds.

23.   Additional Definitions.

The following terms are used with limited exceptions, in Auctions of Auction Rate Securities.

*Auction.* A process in which Holders and Prospective Holders for an issue of Auction Rate Securities indicate their interest in continuing to hold or purchase such securities. The Auction Agent reviews all Orders and determines the lowest Rate that will result in the sale of all securities being auctioned in accordance with the applicable Auction Procedures.

*Auction Agent.* An agent of the issuer or the trustee for the Auction Rate Securities, usually a bank, such as Bank of America, which, under the Auction Procedures, receives Orders and determines the Clearing Rate and the allocation of Auction Rate Securities among Auction

participants.

*Auction Procedures.* The procedures governing the conduct of an Auction, usually set forth in the indenture or resolution covering the securities and *summarized in the prospectus or offering statement for the issue or in supplemental disclosure documents.* These documents, despite their 2006 agreement, Bank of America failed to provide to investors.

*Bid.* A direction by a Holder or Prospective Holder specifying the principal amount of Auction Rate Securities which (i) a Holder commits to continue to hold for the next succeeding Rate Period if the Clearing Rate for such Rate Period is not less than the Rate per annum specified in such Bid or (ii) a Holder or Prospective Holder offers to purchase if the Clearing Rate for the next succeeding Rate Period is not less than the Rate per annum specified in such Bid. Note that in clause (i) above, if the Clearing Rate is less than the Rate specified by a Holder, such Holder is obligated to sell such Auction Rate Securities.

*Bidder.* Each Holder and Prospective Holder who places a Bid.

*Broker-Dealer.* A Broker-Dealer designated in a Broker-Dealer Agreement to solicit Orders for Auction Rate Securities.

*Broker-Dealer Agreement.* The agreement between a Broker-Dealer, the Auction Agent and the issuer under which a Broker-Dealer agrees to solicit Orders for Auction Rate Securities.

*Failed Auction.* An Auction at which the Auction Agent does not receive sufficient Orders at or below the specified Maximum Rate to purchase all the securities being sold. In the case of a Failed Auction, the Rate is set at the Maximum Rate.

*Holders.* The persons who are then the beneficial owners of the Auction Rate Securities; i.e., Plaintiffs.

24.    The interest or dividend rate on Auction Rate Securities is reset periodically to the rate produced in an Auction governed by a set of Auction Procedures, established by the issuer and its Auction Agent and *described in the offering documents.* The frequency of the periodic auctions varies, with common reset periods being daily, 7 days, 28 days, 35 days, 49 days and six months.

25.    Investments in auction rate securities were initially limited to institutional investors,

1  with required minimums of $250,000. Later, issuers and sellers of auction rate securities lowered
2  the minimum amount invested to $25,000, in an effort to market ARS as widely as possible to the
3  general public, including individuals and small investors.

4      26.    Billions of dollars of ARS were issued and sold to institutional, corporate, individual
5  investors as a safe money market-like investment, ostensibly liquid, but with a better short term
6  rate. In fact, ARS were difficult to value because they were usually unsaleable if no secondary
7  market existed.

8      27.    The estimated national value of auction rate securities in existence (prior to the
9  collapse of the auction market) was approximately $300 + billion.

10     28.    The issuer of each auction rate security selected one or more broker-dealers to
11 underwrite the offerings and to manage the auction process. Investors could only submit orders
12 through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer, such
13 as Bank of America, engaged to manage an auction.

14     29.    Bank of America uniformly represented to investors in its written materials and sale
15 presentations by financial advisors that auction rate securities were the same as cash and were
16 highly liquid, safe investments for short-term investing. Bank of America failed to disclose to
17 purchasers of auction rate securities material facts about these securities. Bank of America failed to
18 disclose that these securities were <u>not</u> cash alternatives, like money market funds, and were instead,
19 complex, long-term financial instruments with 30 year maturity dates, or longer. Bank of America
20 also failed to disclose that the auction rate securities it was selling were only liquid at the time of
21 sale because Bank of America and other broker-dealers in the auction market were artificially
22 supporting and manipulating the market to maintain the appearance of liquidity and stability. When
23 Bank of America and the other broker-dealers stopped artificially supporting and manipulating the
24 auction market, the market immediately collapsed and the auction rate securities sold by Bank of
25 America became illiquid.

26     30.    Bank of America further failed to disclose to purchasers of auction rate securities
27 material facts about its role in the auctions and the auction market in which these securities were
28 traded. Bank of America failed to disclose that in connection with the sale of auction rate

securities, Bank of America simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to Bank of America on its holdings of the auction rate securities. Bank of America failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Bank of America failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities.

31. Auction rate securities were extremely profitable for Bank of America and for the Bank of America financial advisors and brokers who sold the securities. As a large underwriter of auction rate securities, Bank of America was paid significant underwritten fees by issuers of the securities. Bank of America also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account.

32. Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market. In May, 2006, the SEC entered into a Cease and Desist Order with a number of major broker-dealers, including Defendant Bank of America, which required them to disclose certain practices to investors and to stop engaging in certain other practices. The 2006 Order required Bank of America, in pertinent part, to do the following, as an affirmative obligation:

> "*each Respondent shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers*, and all broker-dealers who are purchasers, of auction rate securities from the Respondent ("Purchasers") *with a written description of the Respondent's material auction practices and procedures.* A Respondent may fulfill the foregoing requirements to provide such written description to Holders and Purchasers by sending a written notification (e.g., via e-mail, subject to applicable legal requirements) or, with respect to Purchasers, by including a written notification with the trade confirmation, that a written description of the Respondent's material auction practices and procedures is available on a specified web page of the Respondent's website accessible to such Holders and Purchasers." (emphasis added).

33. Despite its agreement to do so, Bank of America routinely failed to provide the notifications and disclosure materials required to its investors. Moreover, Bank of America

1  continued to aggressively market auction rate securities even after it had determined that it and
2  other broker-dealers were likely to withdraw their support for the periodic auctions and that a
3  "freeze" of the market for auction rate securities would result.

4        34.    In fact, on February 13, 2008, 87% of all auctions of auction rate securities failed
5  when all of the major broker-dealers refused to continue to support the auctions decided to
6  withdraw their support of the auction market. As a result of the withdrawal of support by all of the
7  major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300
8  billion of outstanding securities illiquid.

9        35.    During the Class Period, Defendants materially misled the investing public, thereby
10 allowing the auction market to continue and inflating the price of auction rate securities sold by
11 Bank of America by publicly issuing false and misleading statements and omitting to disclose
12 material facts necessary to make Defendants' statements, as set forth herein, not false and
13 misleading. Said statements and omissions were materially false and misleading in that they failed to
14 disclose material adverse information and misrepresented the truth about the auction market and the
15 auction rate securities sold by Bank of America, as alleged herein.

16       36.    At all relevant times, the material misrepresentations and omissions particularized in
17 this Complaint directly or proximately caused or were a substantial contributing cause of the
18 damages sustained by Plaintiff and other members of the Class. As described herein, during the
19 Class Period, Defendants made or caused to be made a series of materially false or misleading
20 statements about the auction market and the auction rate securities sold by Bank of America. These
21 material misstatements and omissions had the cause and effect of perpetuating the auction market
22 and creating in that market an unrealistically positive assessment of the auction rate securities sold
23 by Bank of America, thus causing those securities to be overvalued and artificially inflated at all
24 relevant times. Defendants' materially false and misleading statements during the Class Period
25 resulted in Plaintiff and other members of the Class purchasing and continuing to hold auction rate
26 securities sold by Bank of America at artificially inflated prices, thus causing the damages
27 complained of herein.

28       37.    The collapse of the auction rate securities market in February, 2008 was a direct

1  result of Defendants' unilateral decision to no longer artificially support the auction rate securities
2  market. These actions and omissions by Bank of America directly and proximately caused the
3  terrible financial situation, both with regards to liquidity and lost value, that the ARS market
4  collapse precipitated, and which continues to damage Plaintiffs.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### Against All Defendants

38. Plaintiff realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of himself and the Class.

39. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) enable Defendants to sell hundreds of millions of dollars of auction rate securities to current and prospective Bank of America clients, on which Bank of America made substantial commissions; and (iii) cause Plaintiff and other members of the Class to purchase auction rate securities from Bank of America at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

40. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Bank of America in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

41. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate

and the other members of the Class acquired and continued to hold auction rate securities by Bank of America during the Class Period at artificially high prices and were damaged thereby.

45. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Bank of America, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased and continued to hold their auction rate securities or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

46. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

47. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Bank of America during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act
Against Defendant Bank of America Corporation**

48. Plaintiff realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of himself and the Class.

49. Defendant Bank of America Corporation acted as a control person of Defendants BAIS and BAS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership of BAIS and BAS, Bank of America Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making by BAIS and BAS, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Bank of America Corporation was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

50. As set forth above, BAIS and BAS violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of its position as a controlling person, Bank of America Corporation is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Bank of America during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E. Such other and further relief as the Court may deem just and proper.

////
////
////
////
////
////
////
////
////

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

RUSHALL & McGEEVER

Dated: June 18, 2008

*Eileen McGeever*
Eileen L. McGeever

Eileen L. McGeever
RUSHALL & McGEEVER
6100 Innovation Way
Carlsbad, CA 92009
Telephone: (760) 438-6855
Facsimile: (760) 438-3026

Shawn Khorrami
KHORRAMI POLLARD & ABIR LLP
444 S. Flower Street, 33rd Floor
Los Angeles, CA 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010

```
              UNITED STATES
              DISTRICT COURT
          SOUTHERN DISTRICT OF CALIFORNIA
               SAN DIEGO DIVISION

           # 152191      -- TC

            June 23, 2008
              15:29:53


            Civ Fil Non-Pris
USAO #.: 08CV1115
Judge..: NAPOLEON A JONES, JR
Amount.:                    $350.00 CK
Check#.: BC2299



          Total-> $350.00



FROM: SUMNER B. BEARMAN
      VS.
      BANK OF AMERICA
```

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Sumner D. Bearman

**(b)** County of Residence of First Listed Plaintiff: San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Rushall & McGeever APLC
6100 Innovation Way
Carlsbad, CA 92009  (760) 438-6855

## DEFENDANTS
Bank of America Corp.

County of Residence of First Listed Defendant: Charlotte, NC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'08 CV 1115 J WMc

FILED 08 JUN 23 PM 3:28

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Section 78 et seq.
Brief description of cause:
Securities fraud class action

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ According to proof
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE: 6-18-08
SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**
RECEIPT # 152191  AMOUNT $350  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____
TAC 6/23/08